UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALEXIS JOEL AMAYA,

        Petitioner,

    v.

SCOTT FRAUENHEIM,

        Respondent.

Case No. 16-cv-05069-PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted.  Respondent filed an answer and lodged exhibits with the court and petitioner filed a traverse.  For the reasons set out below, the petition is denied.

## BACKGROUND

      A jury found petitioner guilty of two counts of sexual penetration of a child aged 10 or younger.  *People v. Amaya*, No. H04051, 2015 WL 5445613, at *1 (Cal. Ct. App. Sep. 16, 2015).  Petitioner was sentenced to two concurrent terms of 15 years to life in prison.  *Id.*  On September 16, 2015, the California Court of Appeal affirmed the conviction in an unpublished decision.  *Id.*  The California Supreme Court denied review on November 24, 2015.  Answer, Exs. 5-6.

      Petitioner filed this federal habeas petition on September 1, 2016.  Docket No. 1.  The petition was stayed so petitioner could exhaust further claims in state court.  Petitioner then filed a petition in the California Supreme Court; it was denied without comment or citation on February 15, 2017.  Answer, Exs. 9-10.  On May 26, 2017, the court lifted the stay, reopened the case and ordered respondent to show cause why the

petition should not be granted.

**STATEMENT OF FACTS**

The facts relevant to the petition, as described by the California Court of Appeal, are as follows:

1. Overview

At the time of the offenses, defendant was a 25–or 26–year–old musician in San José. The victim, J.J., was his nine-year-old niece. E.A. FN.2 defendant's brother and J.J.'s father, was married to the victim's mother, M.J.

> FN. 2 We refer to the victim's father as E.A. to avoid confusion.

In December 2011, when J.J. was 13, her parents took her to a therapist. J.J. revealed to the therapist that defendant had molested her when she was nine. The therapist told her parents and alerted CPS, who in turn informed law enforcement. The police contacted J.J. and her parents in January 2012. By that time, E.A. had told defendant about J.J.'s accusations.

The police arranged a pretext phone call between J.J. and defendant. When J.J. confronted defendant with her claims, he denied touching her and suggested she might have misinterpreted something that had happened while they were playing a game. Subsequently, defendant voluntarily went to the police station for an interview. He told the police that J.J. may have misunderstood something that had occurred during a game. At trial, defendant repeatedly and consistently denied J.J.'s accusations.

2. Testimony of J.J.

J.J. was 14 years old when she testified at trial in 2013. (She was nine years old when defendant first touched her.) At the time of the offense, J.J. was living in San José with her parents, her aunt and uncle, and a younger sister. The touching occurred in defendant's bedroom, where there were two beds—defendant's bed and his wife's bed.

J.J. testified that she and her sister were watching a movie on defendant's bed in his bedroom. J.J. was wearing a nightgown with underwear underneath. Defendant was on the bed with them. J.J. was lying with her back against the front of defendant's body, and J.J.'s sister was lying in front of J.J., who had her arms around her sister. Defendant had his arms around J.J.

2

At some point, J.J.'s sister left the room, leaving defendant and J.J. alone. Defendant had his hands on J.J.'s legs, and he started moving them up towards her stomach under her nightgown. This made J.J. feel uncomfortable but she did not say anything because she was scared. When defendant's hands reached J.J.'s stomach, he moved them lower and put them under her underwear. Defendant touched J.J.'s vagina and put his finger inside. His fingers were moving in and out, hurting J.J. When J.J. started crying, defendant told her to be quiet. The incident lasted about five minutes. Defendant stopped touching J.J. when her sister came back into the room. J.J. was scared and upset, but did not say anything to defendant or her parents at the time because she was not sure they would believe her.

Defendant touched J.J. again the next day. J.J. and her sister were on defendant's wife's bed watching a movie. Defendant told them to get on his bed with him. J.J. did not want to get into defendant's bed, but she did so because her sister wanted to. J.J. arranged for her sister to lie between defendant and herself because she did not want him to touch her again. When her sister left the room, defendant took J.J.'s wrist and pulled her toward him. He did the same thing to J.J. that he had done the day before. He put his finger inside her vagina and moved it. This caused J.J. more pain than it did the day before, but she did not say anything to him. He did not say anything either. This lasted about five minutes. Defendant stopped when J.J.'s sister came back. J.J. did not tell her parents about this second incident at the time because she thought they might not believe her and she was afraid she might get in trouble.

J.J. did not tell an adult about the molestation until she was 13, when she told her therapist. In the course of getting to know J.J., the therapist asked if anyone had ever touched her inappropriately. J.J. paused for a while and thought about whether to tell the therapist. J.J. did not want the therapist to tell her parents about the incident or report it to anyone, but she ultimately told the therapist because she thought it might make her feel better. J.J. was mad when the therapist told her the incident would have to be reported. She did not want to talk to the police, but eventually spoke with them.

The police arranged for a pretext call between J.J. and defendant. J.J. got mad during the call because defendant repeatedly denied the molestation and suggested J.J. must have been confused about a game they were playing.

3. Testimony of J.J.'s Parents

M.J. and E.A. did not learn of the molestation until they took J.J. to the therapist in December 2011. At that time, M.J. and E.A. were separated. E.A. was living with defendant and defendant's wife.

After the therapist spoke with J.J. alone, the therapist told E.A. and M.J. about J.J.'s claims. The therapist told them she would have to report the claims to law enforcement. After the appointment, E.A. told defendant what the therapist had told them J.J. had said.

The police subsequently left a phone message for J.J.'s parents asking them to call back. The next month (January 2012), the police called the parents again, whereupon E.A. called them back. At that point, E.A. took J.J. to the police to be interviewed.

E.A. testified that he never observed anything improper between defendant and J.J. He also testified that he had never seen defendant engage in any conduct to indicate he would be involved in such an offense.

4. Testimony of Jeffrey Nichols and the Pretext Phone Call

Jeffrey Nichols was a criminal investigator for the District Attorney's office. He testified the case was first reported to the police on December 20, 2011. He called J.J.'s parents on December 27 and left a message for them. They did not call him back at that point. He called them again on January 10, 2012. He also notified them by letter that they had 14 days to respond. M.J. contacted him on January 10, 2012, and he met with J.J. two days later.

On January 13, 2012, Nichols arranged for a pretext phone call between J.J. and defendant. The call was undertaken mostly in Spanish. Nichols testified that J.J. was nervous and cried during the call.

The prosecution played an audio recording of the call for the jury and provided the jury with a transcript in both Spanish and English. When defendant answered the phone, J.J. told him she was home from school because she was sick. She asked him if he remembered touching her when she was nine, and she expressed concern that she could get pregnant. Defendant, while expressing surprise and confusion, said he did not understand what she was talking about. J.J. told defendant, "You touched me down there like inappropriately." FN.3 Defendant denied doing so. J.J. responded, "Yes, you put your fingers there on my va—on my vagina." Defendant asked J.J. if she was referring to some game they might have been playing. J.J. stated they were not playing a game at the time. She said it happened when they were on defendant's bed, after her sister had left the room. Defendant recalled playing with J.J. and the other children, and he suggested again that she must be misinterpreting what had happened during a game. J.J. continued to insist that it had not happened during the course of a game. Defendant continued to suggest that she was misinterpreting or misunderstanding what had happened during some game—e.g. when he had hugged her or picked her up. At no point did defendant admit touching J.J.'s vagina.

4

FN. 3 Quotations in English are taken from the translation.

Defendant voluntarily went to the police station to be interviewed by Nichols. A third officer acted as a translator. Defendant told police that J.J. may have misunderstood something that occurred during a game. He also stated that he could have touched her accidentally. Part way through the interview, the police conduct "a DNA ruse." They falsely told defendant they had performed DNA testing on J.J.'s vagina. They then presented defendant with a phony test report purporting to show that his DNA had been found on her vagina. When they asked defendant to explain the result, he responded that "perhaps I touched her part in some moment I did not realize." At no point did defendant confess to performing any sexual act on J.J.

5. Expert Testimony on Child Sexual Abuse Accommodation Syndrome

Miriam Wolf, a licensed clinical social worker, testified for the prosecution as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). She was unaware of the facts of the case. She did not interview any witnesses, read any reports or transcripts, or participate in the investigation in any way.

Wolf testified that CSAAS is a term that first appeared in an article by Dr. Ronald Summit in the Journal of Child Abuse and Neglect in 1983. Dr. Summit wrote the article to document some of the behavior he saw in treating child victims of sexual abuse. He wrote the article because the child victims he was familiar with displayed patterns of behavior that were unexpected by adults. Wolf testified that the article was not a research article; it was based on anecdotal evidence. And she testified that CSAAS is not an actual syndrome or a diagnosis indicating whether a child has been sexually abused.

Wolf also testified that CSAAS consists of five categories of behavior: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) retraction. Secrecy refers to the fact that abuse generally occurs in secret. The abuser is often in a position of power, and communicates the need for secrecy to the child. Helplessness refers to the child's cognitive inability to understand and appreciate the consequences of a sexual encounter with an older person. The child may experience emotional helplessness because the abuser sends the message that the child cannot disclose the abuse to trusted persons such as teachers and parents, or the child believes that such people will not be available to help them. Entrapment and accommodation mean that children have to figure out how to cope with the situation and continue with their daily lives. Some children appear outwardly healthy,

while others may develop psychosocial symptoms as a way of coping. Delayed, conflicting, or unconvincing disclosure means the child may not disclose the abuse for a long period of time, and the disclosure does not "come out in a nice, neat package the way an adult might expect it to . . . ." The disclosure may be conflicted or unconvincing, and parts of it may not make sense to an adult. And finally, retraction or recantation refers to the fact that a child may take back claims of abuse due to the consequences of disclosure, such as the loss of parental support or criminal prosecution.

Wolf noted that Dr. Summit published a subsequent paper in 1992 expressing concern about how CSAAS was being used in court. He wrote that he had never intended for CSAAS to be used as a diagnostic tool or checklist. He had only intended to dispel myths held by many adults about how children would behave when molested. Dr. Summit expressed concern that prosecutors were using CSAAS to prove criminal cases, whereas CSAAS is not intended to be used to determine the truth or falsity of allegations. Instead, CSAAS starts with the premise that allegations made by a child victim are true.

Wolf testified that she had seen many of these patterns of conduct in children she had worked with. She also noted that Dr. Summit's research has not been universally accepted by other researchers, but there is a "growing consensus" on many aspects of CSAAS. As to delayed disclosure, Wolf testified that there is "a lot of consensus among different researchers that children don't disclose sexual abuse for lengthy periods of time, sometimes into adulthood. When they do disclose, it is often after lengthy delays." On cross-examination, Wolf testified that recantation or retraction is not as common as Dr. Summit believed it to be at the time of his original article.

6. Testimony of Defendant

Defendant testified in his defense. He was born in El Salvador in 1982 and had 15 siblings. He had a sixth grade education. He worked as a musician in a band with two of his brothers, and he did yard work. He was married but had no children.

Defendant repeatedly denied touching J.J.'s vagina or "private parts." E.A. told him about J.J.'s allegations on December 20, 2011. E.A. only told him that J.J. had claimed he had touched her; defendant did not know what form or manner of touching she had alleged. Defendant called all his siblings and told them what was happening. He did not talk to J.J. about it until she called him several weeks later. He thought the call was a joke or "like a game." At the time, he did not know she had accused him of putting his finger in her vagina.

6

### 7. Other Defense Witnesses

Numerous relatives and friends testified as character witnesses on defendant's behalf, including four brothers, three sisters, one sister-in-law, two friends, and his wife. They generally testified that it was not within defendant's character to commit a sexual act on a minor, and that they had never seen him do so. On cross-examination, several relatives also testified that they believed J.J. was an honest person.

*Amaya*, 2015 WL 5445613, at *1-4.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the

application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). The court looks to the California Court of Appeal opinion for claims three, four and five.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, as with claims one and two, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) trial counsel was ineffective for failing to file a motion to suppress with respect to the pretext call, and the trial court erred in admitting the evidence of the phone call; (2) appellate counsel was ineffective for failing to raise the above claims; (3) the trial court erred in admitting Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence; (4) the trial court erred in allowing supplemental arguments by counsel during the jury's deliberation, and counsel

1    was ineffective for failing to object; and (5) the trial court abused its discretion in denying

2    petitioner probation.

3        **I.    PRETEXT PHONE CALL**

4        Petitioner argues that trial counsel was ineffective for failing to file a motion to

5    suppress evidence of the pretext phone call between himself and J.J.  He also argues

6    that the phone call was illegally obtained and improperly admitted into evidence.

7        **LEGAL STANDARD**

8        A claim of ineffective assistance of counsel is cognizable as a claim of denial of

9    the Sixth Amendment right to counsel, which guarantees not only assistance, but

10   effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

11   The benchmark for judging any claim of ineffectiveness must be whether counsel's

12   conduct so undermined the proper functioning of the adversarial process that the trial

13   cannot be relied upon as having produced a just result. *Id.*

14       In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim,

15   petitioner must establish two things.  First, he must establish that trial counsel's

16   performance was deficient, i.e., that it fell below an "objective standard of

17   reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88.

18   Second, he must establish that he was prejudiced by trial counsel's deficient

19   performance, i.e., that "there is a reasonable probability that, but for counsel's

20   unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

21   A reasonable probability is a probability sufficient to undermine confidence in the

22   outcome. *Id.*

23       **ANALYSIS**

24       As discussed above, law enforcement facilitated a phone call between the victim,

25   J.J., and petitioner regarding the alleged sexual molestation.  The phone call was

26   recorded and played for the jury.  Petitioner argues that trial counsel was ineffective for

27   failing to file a motion to suppress the phone call evidence as an illegal search and

28   seizure pursuant to California Penal Code section 1538.5.  Petitioner has cited no

9

authority that the pretext phone call violated the Fourth Amendment, nor has he presented any arguments that a motion to suppress would have been successful as a violation of state law or Supreme Court authority. Moreover, the Ninth Circuit has held that wiretaps obtained with the consent of one party to a conversation do not violate the Fourth Amendment. *See United States v. Keen*, 508 F.2d 986, 989 (9th Cir.1974). "[T]he failure to take a futile action can never be deficient performance." *Rupe v. Wood*, 93. F.3d 1434, 1445 (9th Cir. 1996). Petitioner has failed to show that counsel was deficient for failing to file a motion to suppress or that such a motion would have been granted had it been filed. Moreover, petitioner denied any wrongdoing in the phone call and expressed shock by the allegations. He has not shown any harm resulted from the phone call and thus has not demonstrated prejudice. In fact it is arguable that the phone call evidence supported his testimony that he was shocked by the allegations and had done nothing wrong. The state court's denial of this claim was not objectively unreasonable, and the claim is denied.

To the extent that petitioner challenges the phone call as a violation of the Fourth Amendment, that claim was previously dismissed pursuant to *Stone v. Powell*, 428 U.S. 465, 481-82 (1976). Docket No. 11. Nor did the admission of the phone call evidence violate due process. The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)); *see, e.g., Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2015) (amended 2016) (because there is no Supreme Court case establishing the

fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).[1]  Therefore, the state court ruling was not an unreasonable application of Supreme Court authority.

## II.   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner next argues that appellate counsel was ineffective for failing to raise the claims that (1) trial counsel was ineffective and (2) that the trial court erred with respect to admitting the pretext phone call evidence.

### LEGAL STANDARD

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland.  Smith v. Robbins*, 528 U.S. 259, 285 (2000).  First, the petitioner must show that appellate counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that appellate counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issues, the petitioner would have prevailed in his appeal.  *Id.* at 285-86.  It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

---

[1] To the extent petitioner has exhausted and raised a claim that counsel failed to investigate exculpatory evidence, any such claim is denied.  He has failed to present any arguments or allegations in support of the claim.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

1  **ANALYSIS**

2      Petitioner has failed to demonstrate that the state court opinion denying this claim

3  was objective unreasonable.  As discussed above, petitioner failed to show that trial

4  counsel was deficient for failing to file a motion to suppress or that he suffered any

5  prejudice from that failure; therefore, petitioner cannot show that appellate counsel was

6  ineffective for failing to raise the same issue on appeal.  Nor has petitioner shown that the

7  trial court, in admitting the evidence, violated state law and that the violation would have

8  served as the basis for a colorable appeal issue.  As noted above, the evidence of the

9  phone call arguably supported petitioner's testimony that the allegations were surprising

10  to him and false.  This claim is denied.

11  **III.**    **ADMISSION OF EVIDENCE**

12      Petitioner argues that the trial court erred in admitting the CSAAS evidence.

13  **LEGAL STANDARD**

14      The Supreme Court "has not yet made a clear ruling that admission of irrelevant or

15  overtly prejudicial evidence constitutes a due process violation sufficient to warrant

16  issuance of the writ."  *Holley*, 568 F.3d at 1101.  The Ninth Circuit has held that CSAAS

17  testimony is admissible in federal child sexual abuse trials, where the testimony concerns

18  general characteristics of victims and is not used to opine that a specific child is telling

19  the truth.  *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003); *United States v. Bighead*,

20  128 F.3d 1329 (9th Cir. 1997) (per curiam).  In *Brodit*, the Ninth Circuit recognized that

21  CSAAS evidence "describes various emotional stages, experienced by sexually abused

22  children, that may explain their sometimes piecemeal and contradictory manner of

23  disclosing abuse."  350 F.3d at 991.  The court observed that inconsistencies in a child's

24  account of abuse, including delays in reporting, do not necessarily mean the child is lying.

25  *Id.*  Ultimately, the *Brodit* majority approved of the California Court of Appeal's holding in

26  *People v. Patino*, 26 Cal. App. 4th 1737 (1994), that the use of CSAAS evidence in a

27  child abuse case does not necessarily offend a defendant's due process rights.  *Brodit*,

28  350 F.3d at 991.

The Ninth Circuit has also rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony. *See Bighead*, 128 F.3d at 1330-31. In *Bighead*, the Ninth Circuit held that there was no abuse of discretion in the district court's admission of expert testimony about certain characteristics of child sexual abuse victims in the prosecution's rebuttal. *See id.* The court noted that the expert did not testify about the facts of the particular case, or about the particular victim, whom she had never examined. *Id.* Rather, the testimony was limited to evidence of "delayed disclosure" and "script memory," which were indicative of abused children as a class of individuals. *Id.* Further, in addressing a relevancy challenge, the court stated, "[the expert's] testimony had significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony." *Id.* The *Bighead* court affirmed the defendant's conviction, holding that the district court did not abuse its discretion in permitting the expert to testify. *Id.* The court also noted that, "[r]egardless, the jury was free to determine whether the victim delayed disclosure or simply fabricated the incidents." *Id.* at 1331.

**ANALYSIS**

The California Court of Appeal described the relevant state law and rejected petitioner's claim:

1. Procedural Background

Defendant moved in limine to exclude any expert testimony on CSAAS. He argued that such expert testimony failed to meet the standard of admissibility set forth in *People v. Kelly* (1976) 17 Cal. 3d 24, and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Kelly/Frye*). He also argued that admission of CSAAS testimony was erroneous under *People v. Bowker* (1988) 203 Cal. App. 3d 385 (*Bowker*), because the underlying premise—that adults have misperceptions about how abused children behave—was no longer true. On that basis, defendant argued that CSAAS testimony was irrelevant, lacked probative value, and presented an undue risk of prejudice. Alternatively, defendant argued that CSAAS testimony, if admitted, must be limited to a general description

13

of CSAAS and not applied to the facts of this case.

In a pretrial hearing, the trial court tentatively ruled that CSAAS testimony would be conditionally admitted, pending the details of J.J.'s testimony. After J.J. testified, the parties offered further argument. Given the facts of J.J.'s testimony, the court found the proffered CSAAS testimony would be relevant and helpful to the jury. The court then ruled the testimony admissible.

After the close of evidence, the trial court instructed the jury based on CALCRIM No. 1193 as follows: "You have heard testimony from Miriam Wolf regarding child sexual abuse accommodation syndrome. Miriam Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.J.'s] conduct was not inconsistent with the conduct of someone [who] would [have] been molested and in evaluating the believability of her testimony."

. . . .

3.    Admission of CSAAS Testimony Was Not an Abuse of Discretion

Defendant challenges the admission of CSAAS testimony on three grounds. First, defendant asserts that the underlying premise justifying the evidence—that jurors hold certain myths and misperceptions about how abused children behave—is no longer a valid premise. Second, defendant contends CSAAS does not have general acceptance in the scientific community. And third, defendant asserts that CSAAS does not meet the requirement that it be beyond the common knowledge of the jury to be admissible as expert testimony.

As to the first contention, the prosecution's expert gave testimony sufficient to support the premise that adults hold the myths and misperceptions CSAAS is intended to dispel. While defendant's trial counsel put forth the argument that adults no longer hold these misperceptions, counsel put no evidence in the record to support this argument. It is well established that the unsworn statements of counsel are not evidence. (*In re Silver's Estate* (1949) 92 Cal. App. 2d 173, 176.) Absent some evidence disproving the premises put forth by the expert, it was not an abuse of discretion for the trial court to admit the expert testimony on this ground.

As to the acceptance of CSAAS in the scientific community, defendant points to two sources. First, he cites a number of academic journal articles refuting the efficacy of CSAAS as a diagnostic tool. Second, he relies on *Commonwealth v. Dunkle* (1992 Pa.) 602 A.2d 830, which concludes CSAAS is not a "generally accepted diagnostic tool." But the expert admitted that CSAAS was never designed for diagnostic purposes. And the prosecution never put forth the testimony

for this purpose. In other words, the expert's testimony was never offered as evidence that J.J. had been molested. Indeed, the trial court specifically instructed the jury not to consider the expert's testimony for that purpose. Absent a showing to the contrary, we assume the jury followed this instruction.

Finally, as to the argument that the expert's testimony was not "[r]elated to a subject that is sufficiently beyond common experience," (Evidence Code section 801, subdivision (b)), the trial court's ruling to the contrary was within its discretion. We decline to reverse the longstanding admissibility of CSAAS evidence in California courts on these grounds. We conclude that admission of the expert's CSAAS testimony did not constitute an abuse of discretion. For the same reasons, trial counsel did not provide ineffective assistance for failing to object on due process grounds; such an objection would have been futile. (*People v. Anderson* (2001) 25 Cal. 4th 543, 587 [defense counsel does not provide ineffective assistance of counsel by declining to lodge a futile objection].) We thus conclude defendant's claims relating to the CSAAS testimony are without merit.

*Amaya*, 2015 WL 5445613, at *4-6.

Here, the CSAAS expert, Ms. Wolf, only testified about the general nature of the syndrome. Reporter's Transcript ("RT") at 155-64. She explained that she did not interview any of the witnesses, investigate the case, or know any specific facts about the case. RT at 153-54. Prior to the expert testifying the trial court informed the jury that:

You will hear testimony from Ms. Wolf regarding child sexual abuse accommodation syndrome. Ms. Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.J.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony.

RT at 155.

At the close of evidence the trial court again addressed the CSAAS evidence instructing the jury:

You have heard testimony from Miriam Wolf regarding child sexual abuse accommodation syndrome.

Miriam Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

You may consider this evidence only in deciding whether or

15

> not [J.J.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.

Clerk's Trancript ("CT") at 215.

Petitioner cites to no Supreme Court authority to support his claim that the trial court's decision to admit the CSAAS evidence violated his right to due process, and the evidence complied with the limits set forth by the Ninth Circuit in *Brodit*. Thus the admission of the evidence did not violate petitioner's due process rights. *See, e.g.*, *Manson v. Grounds*, No. 12–6043 CRB (PR), 2014 WL 688614, at *7-8 (N.D. Cal. Feb. 20, 2014) (rejecting petitioner's challenge to the admission of CSAAS evidence as foreclosed by *Brodit*). Nor can petitioner show that counsel was ineffective for failing to object on due process grounds. Any such objection would have been denied for the reasons set forth above.

## IV.   SUPPLEMENTAL CLOSING ARGUMENT

Petitioner argues that the trial court erred by allowing the parties to present supplemental closing arguments after the jury stated that it was having difficulty reaching a verdict. He argues this violated the Sixth and Fourteenth Amendments and that trial counsel was ineffective for failing to object on constitutional grounds.

### BACKGROUND

The California Court of Appeal set forth the relevant background:

> After approximately nine hours of deliberation over the course of three days, the jury sent the following note to the court: "We are at a stand still! Please give us guidance + direction. HELP." The trial court brought the parties and jurors into court and asked the foreperson for a breakdown of the votes. The foreperson stated the jury was split seven to five. The court asked if it would help to provide clarification of any particular instruction, or to read back any testimony. The foreperson answered in the negative. The court then asked jurors to raise their hand if they felt otherwise, but no juror did so. The court then asked the jury to return to the jury room and added, "if you feel comfortable doing this, if you are able to generally identify or share with the Court just generally what might be the disagreement." The jury subsequently sent a note to the court stating: "define: reasonable +/ define possible doubt." In response, the court reread to the jury CALCRIM No. 220, defining reasonable doubt.

The trial court then posed the following question to the jury: "Would it be helpful for the jury to hear further arguments from the lawyers on this area? What I will do, you will hear from each of them for 10 minutes. I will consider 15, but it's a very limited period of time. And I would ask you to just send a note back that says, yes, further argument will be helpful. Or, no, it would not be helpful." The foreperson answered affirmatively and the jury asked for 15 minutes of argument from each side.

Defendant objected to further argument. He argued as follows: "One of my concerns in this is it's—by allowing the additional argument, especially under these circumstances, is in a sense having the Court and counsel almost participating in the deliberative process and express their concerns, more or less the root of their discussions, at least according to what they told us, and then argument was re-opened and counsel essentially re-argued that. And it seems that we kind of crossed the line there and are actually interfering with the process. The jurors have been given the case. The case has already been argued and now we're communicating with them once again." The prosecution responded that the trial court was authorized to reopen closing arguments under *People v. Young* (2007) 156 Cal. App. 4th 1165 (*Young*). The prosecution further noted that the trial court was proposing to do so in response to the prosecution's off-the-record request for supplemental argument.

The trial court arranged for defendant to argue first and the prosecution to argue second on the basis that the latter had the burden of proof. Defendant argued to the jury that its inability to reach a verdict demonstrated that the jury had reasonable doubt. The prosecution focused on the relative credibility of the victim's testimony compared to the defendant's testimony, arguing the victim had no motive to lie while the defendant had a strong motive to do so.

The jury reached its guilty verdicts the next morning.

*Amaya*, 2015 WL 5445613, at *6-7.

### LEGAL STANDARD

Petitioner cites to no relevant Supreme Court authority, and the court is not aware of any Supreme Court cases specifically on point.[2] However, "[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Thus, an instruction is unconstitutionally coercive if it

---

[2] In *United States v. Evanston*, 651 F.3d 1080 (9th Cir. 2011), and *United States v. Ayeni*, 374 F.3d 1313 (D.C. Cir. 2004), the federal courts of appeals held that the federal trial courts abused their discretion by allowing supplemental arguments with respect to the facts of those cases. The court in *Evanston* noted that it was a case of first impression in the circuit. *Evanston*, 651 F.3d at 1082.

denies the defendant the due process right to a trial by a fair and impartial jury. *DeWeaver v. Runnels*, 556 F.3d 995, 1007 (9th Cir. 2009). The use of a supplemental jury charge given by the court to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation has long been sanctioned. *See Allen v. United States*, 164 U.S. 492, 501-02 (1896).

The Ninth Circuit has said that in a habeas case involving a state conviction the questions for the court are (1) whether the applicable state court looked at the totality of the circumstances in determining if the instruction was coercive; and (2) whether that court's determination on the coercion question was reasonable. *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011); *DeWeaver*, 556 F.3d at 1007 (state appellate court's holding that supplemental jury instruction containing a hypothetical mildly slanted in favor of the prosecution was not coercive was not contrary to *Lowenfield*).

California Penal Code section 1093 governs closing arguments and provides, in part: "When the evidence is concluded, unless the case is submitted on either side, or on both sides, without argument, the district attorney, or other counsel for the people, and counsel for the defendant, may argue the case to the court and jury; the district attorney, or other counsel for the people, opening the argument and having the right to close." Cal. Penal Code § 1093 (e). "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from." *Id.* § 1094. "Section 1094 grants the trial court broad discretion to depart from the order specified in section 1093." *People v. Young*, 156 Cal. App. 4th 1165, 1171 (2007) (holding that the trial court was authorized to reopen closing argument).

California Rules of Court, rule 2.1036(a) provides: "After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict."

Cal. R. Ct. 2.1036(a) (adopted eff. Jan. 1, 2007). "If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may . . . (3) Permit attorneys to make additional closing arguments." Cal. R. Ct. 2.1036(b) (adopted eff. Jan. 1, 2007).

**ANALYSIS**

The California Court of Appeal cited to the opinions from the Ninth and D.C. Circuits but noted these nonbinding authorities were unpersuasive. *Amaya*, 2015 WL 5445613, at *8. The state court denied this claim:

> Furthermore, the record shows the trial court adhered to the procedures required under California law. The jury informed the court it had reached an impasse. The trial court asked the jury whether it had specific concerns the court or the parties could address. The jury responded that it sought guidance regarding the meaning of reasonable doubt. After rereading the appropriate instruction on reasonable doubt, the court asked the jury whether further argument would be helpful; the jury responded affirmatively. And "there were no remarks by the court that could have been viewed as coercive." (*Young*, supra, 156 Cal. App. 4th at p. 1172.) We thus conclude the trial court acted within its discretion by allowing supplemental argument. Moreover, trial counsel did not provide ineffective assistance by failing to object to the additional argument on constitutional grounds because such an objection would have been futile. (*People v. Anderson* (2001) 25 Cal. 4th 543, 587.)

*Id.*

While some circuit cases support petitioner's argument, at least with respect to criminal proceedings in federal district court, there is no relevant Supreme Court authority. The Supreme Court has emphasized that in determining the reasonableness of a state court denial, a federal court may not rely on circuit law. *See Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (circuit cases cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.") In petitioner's case, the state appellate court, noting that the circuit law was nonbinding, also looked to state law and denied this claim. While this court questions the wisdom of a rule of court permitting the reopening of argument after deliberations have commenced, the state court's decision to follow state law while

1   rejecting unbinding federal circuit law, was not objectively unreasonable and petitioner is,

2   therefore, not entitled to habeas relief.

3       The court is aware of the background of this claim and this case. There was not

4   overwhelming evidence in this case.[3] The victim testified about the two occasions of

5   sexual abuse and petitioner denied that either incident occurred. There was no physical

6   evidence. The events happened when the victim was approximately nine years old, and

7   she did not report the occurrences until she was thirteen years old. Petitioner denied that

8   it happened in the pretext phone call and voluntarily went to the police station to be

9   interviewed.

10      When the jury addressed the trial court seeking more information about

11  "reasonable doubt/possible doubt" (RT at 460) they were split seven to five, though it was

12  not disclosed if the majority was favoring guilty or not guilty. The attorneys presented

13  supplemental arguments, and the next morning the jury returned a verdict of guilty.

14  Petitioner was later sentenced to two concurrent terms of 15 years to life.

15      In this case the trial court did not issue a supplemental jury charge or *Allen* charge.

16  The trial court reread CALCRIM No. 220, defining reasonable doubt, and later the

17  attorneys presented their additional arguments. Even if there was Supreme Court

18  authority regarding supplemental arguments and the law was similar to unconstitutionally

19  coercive jury charges as set forth above, petitioner would not be able to overcome the

20  high burden of AEDPA.

21      Petitioner has failed to demonstrate that he was denied the due process right to a

22  fair and impartial trial. Even if the standards for *Parker,* regarding if a state instruction

23  was coercive were applicable to this claim, petitioner has not shown that the state court

24  opinion was unreasonable. *See Parker*, 665 F.3d at 1148. The state court looked at the

25  totality of the circumstances surrounding the jury questions, the trial court's response to

26  

27  [3] While petitioner has not raised a sufficiency of the evidence claim, a review of the evidence shows-based on the high standard for such claims pursuant to *Jackson v. Virginia*, 443 U.S. 307 (1979), subsequent cases and AEDPA-any such claim would not be successful.

28

the questions and the attorneys' supplemental arguments.  The state court's

determination finding no coercion was reasonable.  The court can find no fault in the trial

court's actions, which were reasonable and appropriate, and a review of the substance of

the attorneys' supplemental arguments reveals no error that would enable federal habeas

relief.  For all these reasons, this claim is denied.[4]

## V.    SENTENCING

Petitioner argues that the trial court erred by failing to grant him probation.

### BACKGROUND

The California Court of Appeal set forth the relevant background:

> The probation report recommended that defendant be
> sentenced to two concurrent terms of 15 years to life.  The
> report cited several aggravating factors under California Rules
> of Court, rule 4.414.  Defendant requested that the court grant
> him probation.  Defendant emphasized his lack of any criminal
> record and the probation report's finding that he was a low risk
> for recidivism.  The victim testified at the sentencing hearing
> and expressed in detail the ways in which the offense had
> harmed her.  The trial court found defendant eligible for
> probation, but sentenced him instead to two concurrent terms
> of 15 years to life.  The court found that defendant violated a
> position of trust and caused enormous emotional injury to the
> victim.

*Amaya*, 2015 WL 5445613, at *8.

### LEGAL STANDARD

State sentencing courts must be accorded wide latitude in their decisions as to

punishment.  *See Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987).  Generally,

therefore, a federal court may not review a state sentence that is within statutory limits.

*See id*.  The constitutional guarantee of due process is fully applicable at sentencing.

*See Gardner v. Florida*, 430 U.S. 349, 358 (1977).  A federal court may vacate a state

sentence imposed in violation of due process; for example, if a state trial judge (1)

imposed a sentence in excess of state law, *see Walker*, 850 F.2d at 476, or (2) enhanced

---

[4] Petitioner's trial counsel objected to the supplemental arguments, but petitioner argues
that he was ineffective for failing to object on constitutional grounds.  The state court
denied the claim, and that denial was not unreasonable for the same reasons set forth
above.

United States District Court
Northern District of California

a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error, *see United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995); *Walker*, 850 F.2d at 477.

**ANALYSIS**

The California Court of Appeal set forth the relevant state law and denied this claim:

> Defendant contends the court erred by basing the denial of probation on findings that he took advantage of a position of trust and caused emotional harm to the victim. He contends that a violation of a position of trust is a factor present in virtually every child molestation case. We disagree. An offender can molest a complete stranger under largely random circumstances. Here, by contrast, defendant molested his own niece while babysitting her and her sister, taking advantage of a position of trust.
>
> Defendant also contends the victim described herself as recovering, and that the emotional harm she suffered may have been due to other factors, such as her parents' separation. But the record belies this contention. J.J.'s testimony made abundantly and vividly clear the myriad ways in which defendant's actions caused her serious emotional and psychological damage.
>
> We conclude the trial court did not abuse its discretion by denying a grant of probation.

*Amaya*, 2015 WL 5445613, at *9.

Petitioner's main argument is that the trial court violated state law. The California Court of Appeal found that there was no violation of state law. His federal habeas claim, therefore, is denied. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

To the extent that he has exhausted and raised a claim that the sentence violated due process, any such claim is also denied. Petitioner has not shown that the trial court imposed a sentence in excess of state law or enhanced a sentence based on any improper reasons. The trial court considered the probation report and found several aggravating factors pursuant to state law that supported the denial of probation. RT at

22

513-15.  The state court decision denying this claim was not objectively unreasonable.

**APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that the third claim regarding the CSAAS evidence and the fourth claim regarding the supplemental closing arguments meet the above standard and accordingly GRANTS the COA solely for those two claims.  *See generally Miller-El*, 537 U.S. at 327.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**CONCLUSION**

1.  The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases. Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

2. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 8, 2018

PHYLLIS J. HAMILTON
United States District Judge

\\candoak.cand.circ9.dcn\data\users\PJHALL\_psp\2016\2016_05069_Amaya_v_Frauenheim_(PSP)\16-cv-05069-PJH-hc.docx